**ARIZONA ELECTRIC POWER CO-OPERATIVE, INC., Plaintiff–Appellant–Cross–Appellee,**

v.

**Arnold D. BERKELEY, Defendant–Appellee–Cross–Appellant.**

Nos. 93–16682, 93–16759.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 1995.

Decided July 12, 1995.

William L. Slover, Slover & Loftus, Washington, DC, for plaintiff-appellant-cross-appellee.

Samuel M. Sipe, Jr., Steptoe & Johnson, Washington, DC, for defendant-appellee-cross-appellant.

Before: FARRIS and O'SCANNLAIN, Circuit Judges; MERHIGE, Jr.,* District Judge.

O'SCANNLAIN, Circuit Judge:

We must decide whether to enforce an arbitration award which grants over $7 million in attorneys' fees to an attorney notwithstanding his ethical improprieties.

I

Arizona Electric Power Cooperative, Inc. ("AEPCO") is a rural electric cooperative, headquartered in Benson, Arizona. Berkeley is a lawyer licensed in Washington, DC, who specializes in regulatory matters pertaining to the production, sale, and transportation of natural gas in interstate commerce.

During the 1970s, AEPCO produced electric power with natural gas-fired equipment. AEPCO purchased its natural gas through the City of Willcox, Arizona ("Willcox"), which acquired it from the region's sole supplier, El Paso Natural Gas Company ("El Paso"). The energy crisis of the 1970s prevented El Paso from providing adequate supplies of natural gas to its customers, including AEPCO and Willcox. Consequently, AEPCO hired Berkeley to represent it in proceedings before the Federal Energy Regulatory Commission ("FERC"). Because Willcox was a necessary party to these proceedings, AEPCO retained Berkeley to represent Willcox as well. Prior to 1979, AEPCO paid Berkeley on an hourly basis.

In May 1978, while AEPCO's administrative proceedings before FERC were still in progress, Berkeley filed an action against El Paso in federal court alleging that El Paso had damaged AEPCO and Willcox in the amount of $200 million (the "damages case"). In January 1979, AEPCO and Berkeley entered into a contingency fee agreement ("CFA") which provided that Berkeley would continue to represent AEPCO in the ongoing administrative proceeding for an annual fee of $400,000. The CFA also provided that Berkeley's fees for the recently-filed damages case would consist of specified percentages of any actual recovery that AEPCO received from El Paso. Actual recovery was defined to include money or other benefits of value received by AEPCO. The CFA provided that any differences as to the construction of that document were to be settled by arbitration pursuant to the Arizona Arbitration Statute, Arizona Revised Statutes Annotated §§ 12–1501 *et seq.*

On December 15, 1980, Berkeley settled both the administrative proceeding before FERC and the damages case. In settlement, AEPCO received a package of new gas rights from El Paso, but no money changed hands.

In August 1982, Berkeley and AEPCO amended the CFA to provide that certain

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

benefits that were received by AEPCO from El Paso were obtained in settlement of the damages case. Pursuant to the amended CFA, AEPCO then made payments to Berkeley totaling $2.7 million.

At some point Berkeley apparently decided that AEPCO was not paying him what he was due under the CFA. Accordingly, in August 1987, while he still represented AEPCO in other matters, Berkeley hired AEPCO's former general manager, Jerome Flanders, whom AEPCO had fired for cause. For approximately three and one-half years, Flanders assisted Berkeley in preparing a claim against AEPCO for additional legal fees. Berkeley remained AEPCO's attorney throughout this period and apparently never informed AEPCO that he believed that AEPCO had failed to comply with the CFA.[1] As AEPCO's counsel, Berkeley was asked annually by AEPCO's auditors if he was aware of any significant claims against AEPCO. Berkeley never mentioned that he believed that AEPCO owed him substantial legal fees or that he and Flanders were preparing a demand for arbitration regarding those fees.

In May 1991, Berkeley filed a demand for arbitration, seeking more than $67 million in additional legal fees. AEPCO denied that it owed Berkeley any additional fees and promptly fired Berkeley. However, Berkeley continued to represent Willcox in the same natural gas matter in which he previously represented AEPCO. This matter included a dispute about whether AEPCO rather than Willcox could be a direct customer of El Paso. Berkeley had previously advised AEPCO that a settlement agreement permitted AEPCO to become a direct customer of El Paso at will; after he was discharged, Berkeley took the diametrically opposite position on behalf of Willcox. AEPCO filed an action against Willcox in the United States District Court for the District of Columbia to prevent it from interfering with AEPCO's attempt to establish a direct relationship with El Paso. Although the district court concluded that a temporary restraining order was not warranted because money

damages would be an adequate remedy, the district court noted that AEPCO had made a strong showing that Berkeley's actions constituted a breach of the fiduciary duties that he owed to AEPCO. The parties subsequently settled that suit.

Based on information it learned through discovery, AEPCO filed a counter-claim in the arbitration. AEPCO accused Berkeley of committing fraud in securing the 1982 amendment to the CFA, alleging that he "wrongfully transposed benefits received from El Paso in the Administrative Proceedings to the Damage Case." AEPCO also alleged that Berkeley had breached numerous fiduciary and ethical duties that he owed to AEPCO.

In accordance with the arbitration clause in the CFA, AEPCO and Berkeley each selected an arbitrator. They repeatedly attempted to agree on a neutral, third arbitrator from the American Arbitration Association ("AAA") lists, but could not. AEPCO insisted that the neutral arbitrator have judicial experience. Finally, each party agreed to list six candidates from the AAA lists. If the parties listed a common candidate, then that person would be selected. If not, each side would choose a candidate from the other's list, and the AAA would randomly choose the third arbitrator from the two candidates selected.

The parties did not select a common candidate. Berkeley had nominated only one candidate with judicial experience—Paul Pfeiffer, a retired administrative law judge—so AEPCO selected Pfeiffer from Berkeley's list. The AAA randomly chose Pfeiffer to be the third arbitrator.

After he was notified of his appointment, Pfeiffer disclosed to the AAA that Berkeley had been on the staff of the Civil Aeronautics Board during the time that Pfeiffer served as a hearing Examiner for that agency between 1947 and 1961. Pfeiffer stated that he thought that he and his wife had visited with Berkeley and his wife on possibly two occa-

---

1. AEPCO implies that Berkeley did not inform it that he was preparing a fee claim because, during that period, Berkeley was earning substantial non-CFA fees from AEPCO. Thus, Berkeley rea-

sonably feared that AEPCO would discharge him once it learned that he was demanding additional compensation under the CFA.

sions during that period. Pfeiffer also thought that he had had lunch with Berkeley one or two times after he left the agency. However, Pfeiffer stated (and it is not disputed) that he had not had any contact with Berkeley for at least twenty-seven years.

Upon learning this information, AEPCO immediately objected to Pfeiffer's appointment and moved to disqualify him. Pfeiffer would not voluntarily resign, however, and the AAA denied AEPCO's request for disqualification.

A majority of the arbitration panel found that Berkeley was entitled to $9,221,000.00 in contingent legal fees pursuant to the CFA. With respect to AEPCO's counterclaim, a different majority found that Berkeley had breached his fiduciary duties to AEPCO in three ways:

> The conduct of [Berkeley], a senior member of the Bar, first in employing [AEPCO's] former general manager, while continuing to represent [AEPCO], to assist in preparation of the instant claim without notifying [AEPCO]; second, in filing an arbitration demand with the AAA for fees in excess of $67,000,000 without first consulting [AEPCO]; and finally, by continuing to represent his client, the City of Willcox, Arizona in opposition to [AEPCO] in litigation in which the City was attempting to hold [AEPCO's] gas supply hostage, when considered together constitute conduct below the level of propriety expected of a member of the Bar.

As a result, the panel directed Berkeley to remit 15% of the contingency fee award to AEPCO in satisfaction of AEPCO's counterclaim.

AEPCO brought suit in the federal district court, seeking to vacate the award pursuant to section 12–1512 of the Arizona Revised Statutes Annotated. AEPCO claimed that the award could not be confirmed first, because the award violated public policy, and second, because Arbitrator Pfeiffer was biased in favor of Berkeley. Both parties moved for summary judgment, and the district court granted Berkeley's motion. The district court held that Arizona does not recognize public policy as a ground for vacating an arbitral award. Alternatively, the district court held that even if Arizona did permit its courts to vacate arbitral awards on public policy grounds, AEPCO's award would not qualify for the exception. Finally, the district court held that Arbitrator Pfeiffer was not biased. AEPCO appeals.

## II

We review a district court's interpretation of state law de novo. *Ravell v. United States*, 22 F.3d 960, 961 n. 1 (9th Cir.1994). When interpreting state law, federal courts are bound by decisions of the state's highest court. *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir.1990). "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* at 1239.[2]

AEPCO first argues that the arbitral award should not be enforced because it is violative of public policy. The district court rejected this argument, holding that a public policy exception to the enforcement of arbitral awards does not exist in Arizona.

Arizona is one of a large number of states that have enacted the Uniform Arbitration Act ("UAA"), 7 U.L.A. 1 (1955), and Arizona courts have not squarely addressed whether they recognize a public policy exception to the enforcement of arbitral awards. AEPCO notes that several states that have enacted the UAA have recognized the public policy exception despite the fact that the statute does not mention it. Further, AEPCO notes that the Supreme Court has read a public policy exception into the Federal Arbitration Act, even though that statute also fails to mention public policy as a ground for vacat-

---

**2.** Our "review of an arbitrator's decision is *extremely* narrow." *Stead Motors v. Automotive Machinists Lodge*, 886 F.2d 1200, 1208 n. 2 (9th Cir.) (emphasis in original) (en banc), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). Here, however, we are not asked to review the arbitrator's decision, but to determine whether Arizona law precludes enforcement of that decision.

ing an award. AEPCO believes that Arizona would be likely to follow these authorities.

We need not decide whether Arizona would recognize a public policy exception to the enforcement of arbitral awards because we conclude that the award in the instant case would not qualify for such exception in any event.

According to AEPCO, the public policy at issue is that "which precludes the compensation of unethical attorneys."[3] Since there are no Arizona cases discussing a public policy exception, we look to federal law for guidance. In *Stead Motors v. Automotive Machinists Lodge*, 886 F.2d 1200 (9th Cir.) (en banc), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990), this court held that in order to vacate an arbitral award on public policy grounds, a court must articulate "an explicit, well defined and dominant public policy," and it "must demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator." *Id.* at 1212–13 (quotations omitted).

The district court concluded that AEPCO's claim fails the first prong of the *Stead* test; that is, AEPCO's cited public policy is not sufficiently "well defined and dominant." We agree.

Although AEPCO can point to a number of cases where unethical lawyers were required to disgorge their entire fee, many cases have held otherwise. Indeed, courts have indicated that whether the attorney is entitled to any compensation is a fact-specific inquiry. *See, e.g., In re Eastern Sugar Antitrust Litig.*, 697 F.2d 524, 533 (3d Cir.1982) (noting that while some courts "disallow attorneys' fees for services rendered before the occurrence of the ethical violation," such a sanction should be reserved for cases in which the breach of professional ethics is sufficiently "egregious"); *New York N.H. & H.R. Co. v. Iannotti*, 567 F.2d 166, 175 (2d Cir.) (noting

that it is not mandatory for courts "woodenly . . . [to] deny compensation in every case of conflict of interest, regardless of the facts"), *cert. denied*, 434 U.S. 833, 98 S.Ct. 120, 54 L.Ed.2d 94 (1977); *Matter of Chicago & West Towns Railways*, 230 F.2d 364, 369 (7th Cir.) (noting that although "[a]uthority exists for the disallowance of all fees," the better view is that "some reasonable allowance for such services should be made"), *cert. denied* 351 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956). These cases show that there does not exist a uniform public policy preventing unethical attorneys from collecting *any* fees.

■ The very fact that the public policy regarding fee collection by unethical lawyers is so fact-specific suggests that it is not sufficiently "well defined and dominant" to fall within the public policy exception. Further, courts should be reluctant to vacate arbitral awards on public policy grounds. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (there is no "broad judicial power to set aside arbitration awards as against public policy"). The primary reason that parties resort to arbitration is to gain the benefit of a quicker, easier dispute resolution process. These benefits would be radically diminished if courts readily entertained public policy challenges to arbitral awards. The finality of arbitral awards must be preserved if arbitration is to remain a desirable alternative to courtroom litigation.

■ Finally, we are persuaded by the Arizona Supreme Court's opinion in *Matter of Swartz*, 141 Ariz. 266, 686 P.2d 1236 (1984) (en banc). After concluding that Swartz charged his client a clearly excessive fee, the Arizona Supreme Court, sitting en banc, censured him in strong terms, and, noting that

---

3. We assume for the sake of argument that Berkeley would be considered an unethical attorney. However, we are well aware that the issue is hotly disputed, as evidenced by the exhaustive expert testimony of Professors Stephen Gillers on Berkeley's behalf, and Geoffrey Hazard on AEPCO's behalf. We also note that the District of Columbia Bar Counsel found that two of the three acts criticized by the arbitration panel were

not ethical violations. However, the Bar Counsel did find that Berkeley violated Rule 1.9 of the District of Columbia Rules of Professional Conduct by taking a position in his representation of the City of Willcox that was diametrically opposed to the position that he had previously championed on behalf of AEPCO. Office of Bar Counsel, Docket No. 478–92 (March 26, 1993).

Swartz had previously been disciplined for ethical violations, suspended him for six months and fined him $3,405.50. Nonetheless, the court did not require Swartz to disgorge his entire fee; rather, the court ordered Swartz to refund only the excessive portion. Based on *Swartz*, it appears that the public policy which AEPCO champions is not well defined and dominant in Arizona.

## III

Section 12–1512(A) of the Arizona Revised Statutes Annotated requires a court to refuse to confirm an arbitral award if "there is evident partiality" by the neutral arbitrator. Accordingly, AEPCO asks us to refuse to confirm Berkeley's award because Arbitrator Pfeiffer exhibited "evident partiality." AEPCO's charges of bias stem from Pfeiffer's previous relationship with Berkeley and Pfeiffer's behavior during the arbitration.

■ Because there is no Arizona case law defining "evident partiality," we must again look to federal law. We have held that "the appearance of impropriety, standing alone, is insufficient to establish bias." *Toyota of Berkeley v. Automobile Salesmen's Union, Local 1095*, 834 F.2d 751, 755 (9th Cir.1987), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988). Rather, the party alleging bias must "establish specific facts that create a 'reasonable impression of partiality.'" *Id.* at 756 (quoting *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745 (9th Cir.1985)).

■ AEPCO has failed to assert such specific facts. A social relationship that ended more than twenty-seven years before the arbitration took place is not sufficient to establish bias. AEPCO has also failed to point to anything in the arbitration hearing that would lead us to conclude that Pfeiffer's behavior demonstrated evident partiality. Though it might have been preferable for Pfeiffer to have recused himself, given AEPCO's strenuous objection to his participation, we cannot say that his failure to do so constituted evident partiality.

AEPCO disputes the test for establishing bias, however, and maintains that the high standards that a party must ordinarily meet in order to show arbitrator bias are premised on the belief that "parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute." *Morelite Const. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83 (2d Cir.1984). According to AEPCO, courts reason that because "[f]amiliarity with a discipline often comes at the expense of complete impartiality," *id.*, judges should be reluctant to find bias. AEPCO contends, however, that in the instant case, "the trade-off between expertise and impartiality," *id.*, did not exist because Pfeiffer had no expertise in natural gas matters. Thus, AEPCO asks us to apply a more rigorous bias test to Pfeiffer and conclude that there was "evident partiality."

We are unpersuaded. Though courts often do premise their reluctance to find bias on the assumption that the parties have traded impartiality for expertise, no court has said the reverse: that is, that arbitrators who are not experts must have their impartiality tested by heightened standards. Indeed, arbitration's purpose—to be an expeditious and economical dispute resolution process—would be frustrated by open-ended judicial inquiries into relative expertise versus relative impartiality. In any event, Pfeiffer's judicial expertise apparently was a factor in his selection by AEPCO.

## IV

■ Berkeley asks this court to exercise its discretion to sanction AEPCO for filing a frivolous appeal pursuant to 28 U.S.C. § 1912 and Rule 38 of the Federal Rules of Appellate Procedure. "An appeal is frivolous when the result is obvious or the appellants' arguments are wholly without merit." *Bell v. City of Kellogg*, 922 F.2d 1418, 1425 (9th

Cir.1991). We conclude that AEPCO's appeal is not frivolous.[4]

AFFIRMED.

---

**4.** We also reject as moot Berkeley's cross claim seeking to require AEPCO to post a bond pending appeal.