NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Gary E. CALKINS;  Anna Rosa
Calkins, d/b/a Indio Grocery
Outlet, Respondent.

No. 97–71240.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1999.

Decided Aug. 11, 1999.

Richard Cohen, National Labor Relations Board, Washington, D.C., for the petitioner.

Gregory N. Karaskik, Knee & Ross, Los Angeles, California, for the respondent.

Before: BRUNETTI and WARDLAW, Circuit Judges, and SEDWICK, District Judge.[1]

---

1. Hon. John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.

WARDLAW, Circuit Judge:

This case requires us to further refine the principles that govern the relationship between the rights of employees under Section 7 of the National Labor Relations Act (the "NLRA" or the "Act") and the state law property rights of employers. We do so in the fairly unique context of California's limitation of those property rights in favor of rights of expression. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (hereinafter *"PruneYard"*). The precise question before us is whether Respondent violated Section 8(a)(1) of the NLRA by threatening to have, and having, nonemployee Union representatives arrested for engaging in protected informational handbilling and picketing in furtherance of a consumer boycott, on a privately owned walkway and parking lot fronting Respondent's grocery store. The National Labor Relations Board (the "NLRB" or the "Board") determined that Respondent does not have a property right under California law to exclude individuals from the store's walkway and parking lot, and therefore, that Respondent's actions constituted an unfair labor practice. The Board now petitions for enforcement of its Order finding that Respondent committed an unfair labor practice in violation of the Act. We have jurisdiction pursuant to 29 U.S.C. § 160(e), and we grant enforcement.

## BACKGROUND

The parties have stipulated to the determinative facts. Gary E. Calkins and Anna Rosa Calkins are the sole proprietors and operators of the Indio Grocery Outlet, a supermarket located in Indio, California ("Respondent"). Respondent operates the store pursuant to a "Store Operator Agreement" with Canned Foods, Inc. ("CFI"). CFI leases the real property and the building from its owner, Read Properties. The Store Operator Agreement and an amendment thereto give Respondent the right to operate the Indio store.

Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. The United Food and Commercial Workers, Local 1167, United Food and Commercial Workers International Union, AFL–CIO–CLC (the "Union"), is a labor organization within the meaning of Section 2(5) of the Act.

The Indio store is a free-standing building open to the general public, with a parking lot on the west and south sides of the building for use by customers and employees of the Indio store. The parking lot has two entrances and is surrounded on three sides by a public sidewalk with an approximately 140 by 62 foot grass lot located on the east side of the parking lot separating a portion of the parking lot from the public sidewalk. The Indio store has two entrances which can be accessed only through the parking lot. A walkway runs along the front of the store. The Indio store is not part of a shopping mall. Across the public sidewalk, the property is bordered on three sides by public streets, and on one side by California Highway 111.

Respondent avers that on each entrance to the Indio store a sign is posted which states, "Trespassers, solicitors or distribution of literature by non-employees is prohibited on this property" and that Respondent posted the signs when it began operating the Indio store in March 1994. Respondent further avers that Union official Frank Mott was made aware of the policy in September 1994, before the start of the picketing and handbilling campaign. Persons other than customers and employees of the store are excluded from the premises.

The Indio store employees are not represented by the Union or by any union. Eleven picketers representing the Union first came onto Respondent's parking lot on September 30, 1994. When asked to leave the parking lot, the picketers relocated to the public sidewalk.

On December 13, 1994, Union representatives again engaged in peaceful picketing and handbilling in the Indio store parking lot and on the walkway in front of its

entrance, as well as on the public sidewalk. One picketer was stationed by each door to the Indio store, several walked around the parking lot in front of the store, and the rest remained on the public sidewalk. The picketers, approximately nine in total, distributed leaflets to Respondent's customers and employees that read, in English and Spanish: "Don't Shop Canned Foods Grocery Outlet Indio. SUPPORT YOUR UNION NEIGHBORS! UFCW Local 1167" and listed the names and addresses of four Union supermarkets in the Indio area. The picketers also carried signs that read, in English and Spanish, "Please Do Not Shop Grocery Outlet. UFCW Local 1167."

Gary Calkins requested that the picketers leave the parking lot and walkway in front of the store. The picketers refused. Approximately 10 to 15 minutes later, Calkins and three Indio store employees stood at the entrance to the store and distributed handbills of their own to customers entering the store. Respondent's handbills read: "WE ARE NOT ON STRIKE!! Thank you for shopping at Indio Grocery Outlet." [2]

Calkins summoned the Indio Police Department to the property and requested that the police remove the picketers from the walkway and parking lot in front of the store. The police declined to arrest or interfere with the picketers. Calkins informed the picketers that if they did not leave, he would request that the police make a citizens' arrest. The picketers relocated to the public sidewalk. Calkins advised the picketers that if they returned to the store premises, he would request the Indio police to arrest them. Later the same day, after the picketing had ended, the Union was informed by the Indio Police Department that Calkins had requested that the police make a citizens' arrest of picketers who came on his property. The Union then decided to file a charge with the NLRB, which it did two days later, and not to return to the property until after its resolution.

On March 29, 1995, the Union representatives nevertheless returned to engage in peaceful picketing and handbilling on store premises. Again, Calkins asked them to leave. One of the picketers, Joe Duffle, advised Calkins that the picketers had a right to be on his property because the Board had issued a complaint. Calkins again summoned the police and requested that they make a citizen's arrest. They did, after unsuccessfully requesting that the picketers voluntarily leave the property. Duffle was cited by the Indio Police Department for trespassing, but the case was later dropped.

As of July 1995, approximately seven to nine picketers remained on the public sidewalk surrounding the parking lot adjacent to Highway 111. The picketers distributed leaflets to the general public and to customers and employees at the parking lot entrance.

## ADMINISTRATIVE PROCEEDINGS

The Union filed two unfair labor practice charges against Respondent. The first, filed on December 15, 1994, contended that Respondent violated Section 8(a)(1) of the Act in September and December 1994, by having Union representatives threatened with arrest if they picketed and handbilled on Respondent's property. The second, filed on April 5, 1995, contended that Respondent violated Section 8(a)(1) of the Act by having Duffle arrested on March 29, 1995.

On March 20, 1995, the Board issued a complaint and notice of hearing. An

---

**2.** In smaller type, Respondent's handbills also included the following text:

> Dear Valued Customer:
> Thank you for your patronage! We want to be sure you know that none of the people outside picketing are Indio Grocery Outlet employees. We are all happily employed and are receiving competitive wages and

> benefits from our employer. This is a family owned and operated store and we are all inside the store ready to serve you as always. Come back and see us again soon, and *PLEASE BRING YOUR FRIENDS*.
> The Employees of the Indio Grocery Outlet.

The handbill was signed by thirteen Indio store employees.

amended complaint issued on April 25, 1995, consolidating the two charges. The parties waived a hearing before an administrative law judge and moved to transfer the proceeding to the Board for decision. The motion was granted, and the parties submitted a Stipulation of Facts to the Board. The Board rendered its decision on June 30, 1997. *See Calkins d/b/a Indio Grocery Outlet,* 323 N.L.R.B. 1138, 323 N.L.R.B. No. 196, 1997 WL 397549 (1997).

**STANDARD OF REVIEW**

The National Labor Relations Board "has the primary responsibility for developing and applying national labor policy," and its rules are accorded "considerable deference." *NLRB v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 786, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990) (citations omitted). The Board's interpretation of the NLRA is accorded deference as long as it is "rational and consistent" with the statute. *See NLRB v. United Food and Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (citations omitted); *NVE Constructors, Inc. v. NLRB,* 934 F.2d 1084, 1086 (9th Cir.1991). Decisions of the NLRB will be upheld on appeal if its findings of fact are supported by substantial evidence and if the agency correctly applied the law. *See Retlaw Broadcasting Co. v. NLRB,* 172 F.3d 660, 664 (9th Cir. 1999); *NLRB v. Iron Workers of Cal.,* 124 F.3d 1094, 1098 (9th Cir.1997).

**DISCUSSION**

**I**

To determine whether to grant enforcement of the Board's Order, a close review

of its findings and conclusions is essential. First, the Board found that the Union agents' picketing and handbilling constituted conduct protected by the NLRA. *See Calkins,* 1997 WL 397549, at n. 12 (1997). Specifically, the Board found that the Union's activity was "clearly protected under the second proviso to Sec. 8(b)(7)(C), which concerns picketing or other publicity for the purpose of truthfully advising the public that an employer does not employ members of, or have a contract with, a labor organization." [3] *See id.*

Second, the Board found that Respondent lacked a property interest that entitled it to exclude individuals from its property. *See id.* at \*6–7. The Board stated that "in cases in which the exercise of Section 7 rights by nonemployee Union representatives is assertedly in conflict with a respondent's private property rights, there is a threshold burden on the respondent to establish that it had, at the time it expelled the Union representatives, an interest which entitled it to exclude individuals from the property." *Id.* at \*6 (quoting *O'Neils Markets, Inc., d/b/a Food for Less,* 318 NLRB 646, 649, 1995 WL 511396 (1995), *affd. in relevant part,* 95 F.3d 733, 153 L.R.R.M. (BNA) 2291 (8th Cir.1996)). The Board noted that "[u]nder California [property] law, neither a shopping center nor its individual tenants have a right to prohibit individuals from handbilling or picketing on [ ] shopping center premises, even though the shopping center is privately owned." *Id.* (citing *Bristol Farms, Inc.,* 311 NLRB 437, 439, 1993 WL 186120 (1993)). It further noted that this holding has been extended to the sidewalk outside a retail store that is not part of a shopping center. *See id.* at \*6 (citing

**3.** Section 8(b)(7) provides in relevant part: "It shall be an unfair labor practice for a labor organization or its agents ... to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor

organization as their collective bargaining representative...." 29 U.S.C. § 158(b)(7). Section 8(b)(7)(C) provides that nothing in that subsection "shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of a labor organization." 29 U.S.C. § 158(b)(7)(C).

*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 25 Cal.3d 317, 158 Cal.Rptr. 370, 599 P.2d 676 (1979) (in bank), *cert. denied,* 447 U.S. 935, 100 S.Ct. 3038, 65 L.Ed.2d 1130 (1980); *In re Lane,* 71 Cal.2d 872, 79 Cal.Rptr. 729, 457 P.2d 561 (1969) (in bank)). The Board concluded that Respondent did not have the right to exclude the Union agents from handbilling on the walkway or parking lot, and that as a result, its interference with such conduct violated Section 8(a)(1) of the Act. *See id.*

Finally, the Board concluded that *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), does not control the outcome of this case. *See id.* In *Lechmere,* the Supreme Court held that a shopping center owner "may validly post his property against nonemployee distribution of union literature," except where union representatives lack reasonable access to employees outside an employer's property. 502 U.S. at 538, 112 S.Ct. 841. Though the Board did not articulate why *Lechmere* did not apply, we infer from the Order that its reasoning is that *Lechmere* applies only when the property owner is entitled, under state law, to exclude individuals engaged in protected Section 7 activity or free speech activity generally.

The Order requires Respondent to cease and desist from the unfair labor practices found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act, 29 U.S.C. § 157. *See id. at* *8. The Order also requires Respondent to post copies of a remedial notice, reflecting the Board's findings and guaranteeing that it will not have Union representatives arrested for picketing and distributing Union literature on Respondent's property, and that it will not interfere with, restrain, or coerce its employees in the exercise of their Section 7 rights. *See id.*

Respondent argues that the Board's reliance on state property law constitutes an analytical error that impermissibly overrides federal labor law. Relying on *Lechmere,* Respondent contends that the Union representatives did not have a right protected under Section 7 to conduct their consumer boycott activities on Respondent's property, and that consequently, its actions did not violate Section 8(a)(1). We must therefore review the Board's resolution of the asserted conflict between state property law and federal labor law.

## II

Section 8(a)(1) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act, 29 U.S.C. § 157]." 29 U.S.C. § 158(a)(1). The core activity protected by Section 7 is the right of employees to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157. "By its plain terms, thus, the NLRA confers rights only on employees, not on unions or their nonemployee organizers." *Lechmere,* 502 U.S. at 532, 112 S.Ct. 841.

However, "insofar as the employees' 'right of self-organization depends in some measure on [their] ability ... to learn the advantages of self-organization from others,'" nonemployees[4] have a "derivative right" to engage in organizational activities under Section 7. *See id.* (citing *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 111–12, 76 S.Ct. 679, 100 L.Ed. 975 (1956)). Protected Section 7 conduct has traditionally consisted of the right to engage in organizing campaigns, *see, e.g., Lechmere,* 502 U.S. at 532–33, 112 S.Ct. 841; but also has come to include the right to conduct area standards picketing and

---

4. "Nonemployees" denotes union representatives who are not employees of the targeted employer. *See O'Neil's Markets v. NLRB,* 95 F.3d 733, 736 n. 4 (8th Cir.1996).

consumer boycott activity. *See, e.g., Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 206 n. 42, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) ("[T]he right to organize is at the very core of the purpose for which the NLRA was enacted .... [whereas] [a]rea standards picketing has only recently been recognized as a § 7 right.").

■ As a general rule, the NLRA does not give nonemployees the right of access to employer's private property to exercise their Section 7 rights. Thus, the "essential issue" in the exercise of derivative Section 7 rights is often "the degree to which trespass is necessary to exercise Section 7 rights." *United Food and Commercial Workers, Local No. 880 v. NLRB,* 74 F.3d 292, 298–99 (D.C.Cir.1996). Acknowledging the tension between labor rights and property rights, the Supreme Court has recognized that in certain limited circumstances, the NLRA "may entitle union employees to obtain access to an employer's property," *Thunder Basin Coal v. Reich,* 510 U.S. 200, 217 n. 21, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994), while in others, an employer is entitled to exclude nonemployee union organizers from his property. *See Lechmere,* 502 U.S. at 540–41, 112 S.Ct. 841. The Court most recently construed the proper accommodation principles in *Lechmere,* which provides the starting point for our analysis.

In *Lechmere,* nonemployee union members engaged in an organizing campaign targeted at employees of a retail store situated on the Lechmere Shopping Plaza in Newington, Connecticut. Union members attempted to distribute handbills in the shopping plaza's private parking lot, but were barred from the property by the store owner. The Board applied the balancing test it had announced in *Jean Country v. Local 305,* 291 NLRB 11, 1988 WL 214053 (1988):

> [I]n all access cases our essential concern will be [1] the degree of impairment of the Section 7 right if access should be denied, as it balances against [2] the degree of impairment of the pri-

vate property right if access should be granted. We view the consideration of [3] the availability of reasonably effective alternative means as especially significant in this balancing process.

*Id.* at 536, 112 S.Ct. 841 (quoting *Jean Country,* 291 NLRB at 14). Based on this analysis, the Board ruled that the employer had engaged in an unfair labor practice by excluding the union because "there was no reasonable, effective alternative means available for the Union to communicate its message to [Lechmere's] employees." *Lechmere, Inc. v. Local 919,* 295 NLRB 92, 93, 1989 WL 224106 (1989).

The Supreme Court, rejecting the Board's balancing test, reversed. It concluded that the employer had not engaged in an unfair labor practice. The Court held that Section 7 of the NLRA does not protect nonemployee union organizers' access to an employer's property except in the rare case where "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels." 502 U.S. at 537, 112 S.Ct. 841 (internal citation and quotation marks omitted). The Court stated that its reference to " 'reasonable' attempts was nothing more than a commonsense recognition that unions need not engage in extraordinary feats to communicate with inaccessible employees—[but was] not an endorsement of the view ... that the Act protects 'reasonable' trespasses." *Id.*

■ At first blush, *Lechmere* appears to create a bright line rule that in all cases, employers may exclude nonemployees from their property (subject to the rare inaccessibility exception). *Lechmere* does not suggest, however, that the NLRA mandates exclusion; the decision simply recognizes that "arguable Section 7 claims do not pre-empt state trespass law." 502 U.S. at 535, 112 S.Ct. 841 (citing *Sears, Roebuck & Co.,* 436 U.S. at 205, 98 S.Ct. 1745). The Court has since clarified this aspect of *Lechmere,* explaining that em-

ployers may exclude union organizers in deference to state common law, but not because the NLRA itself restricts access. *See Thunder Basin Coal,* 510 U.S. at 217 n. 21, 114 S.Ct. 771. "The right of employers to exclude union organizers from their private property emanates from state common law, and while this right is not superseded by the NLRA, nothing in the NLRA expressly protects it." *Id. Thunder Basin Coal* thus makes plain what *Lechmere* left implicit: although the NLRA's protection of Section 7 rights does not trump state property rights, state property law is what creates the interest entitling employers to exclude organizers in the first instance. Where state law does not create such an interest, access may not be restricted consistent with Section 8(a)(1).

Connecticut law, which governed the shopping center in *Lechmere,* protected the owner's right to exclude others, including union organizers, as trespassers. *See Cologne v. Westfarms Assocs.,* 192 Conn. 48, 469 A.2d 1201, 1208–10 (1984). As a result, the owner's exercise of his property right conflicted with the organizers' exercise of protected Section 7 rights, necessitating the accommodation analysis in which the Court engaged. *See* 502 U.S. at 538, 112 S.Ct. 841.

*Lechmere* did not speak to the situation where, as here, an employer's state law property right does not entitle it to exclude organizers. The Board has recognized that in such cases, nonemployees' exercise of Section 7 rights creates no conflict as against any right of the employer. Although an employer's property rights "must be given appropriate respect, an employer need not be accorded any greater property interest than it actually possesses. Thus, the analysis that applies when Section 7 rights and property rights conflict is not appropriately invoked as to an employer that possesses only a property right that, under the law that creates and defines the employer's property rights, would not allow the employer to exclude the individuals." *Bristol Farms,* 311 NLRB at 438 (citing *Johnson & Hardin Co.,* 305 NLRB No. 83, 1991 WL 251699 (1991), *enforced in relevant part, Johnson & Hardin Co. v. NLRB,* 49 F.3d 237, 241–42 (6th Cir.1995)). Accordingly, "an employer's exclusion of union representatives from private property as to which the employer lacks a property right entitling it to exclude individuals ... violates Section 8(a)(1), assuming the union representatives are engaged in Section 7 activities." *Id.; see also O'Neil's Markets d/b/a Food For Less,* 318 NLRB 646, 649, 1995 WL 511396 (1995), *enforced,* 95 F.3d at 738–39.

■ In the administrative proceedings, the Board invoked the rule it has applied consistently since *Lechmere,* that Respondent had a threshold burden to establish an interest entitling it to exclude individuals from its property; and that in the absence of such an interest, "there is in fact no conflict between competing rights requiring an analysis and an accommodation under *Lechmere." Calkins,* 1997 WL 397549, at *6. We conclude that consistent with *Thunder Basin Coal, supra,* the Board has correctly interpreted *Lechmere:* that when an employer lacks an interest entitling it to exclude individuals engaged in Section 7 conduct, *Lechmere's* accommodation analysis is not triggered.

Therefore, to evaluate the rights of the parties before us, we must examine two questions: first, whether the Union members engaged in protected Section 7 activity; and second, whether Respondent possessed a property interest under California law entitling it to exclude that activity.

### III

#### A

■ Respondent first argues that the Union members' conduct was not protected under Section 7 because whether conduct is protected turns not only on its purpose but also its location. This argument erroneously conflates the question of the scope of access to private property with the question of the nature of the protected conduct. It is well settled that

*whether* conduct is protected by Section 7 of the NLRA, and *where* it may be exercised, are distinct inquiries. *See Eastex, Inc. v. NLRB,* 437 U.S. 556, 563, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). Thus, our first consideration is strictly limited to whether the Union was engaged in protected Section 7 conduct.

■ The Board has the responsibility in the first instance to delineate the precise boundaries of Section 7's mutual aid or protection clause. *See, e.g., Eastex,* 437 U.S. at 568, 98 S.Ct. 2505 (citing *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945)); *Sierra Publishing Co. v. NLRB,* 889 F.2d 210, 215 (9th Cir.1989). The Board has ruled that Section 7 protects nonemployees engaging in picketing or other publicity for the purpose of truthfully advising the public that an employer does not employ union members or have a contract with a labor organization. *See, e.g., Bristol Farms,* 311 NLRB 437; *D'Alessandro'S Inc. v. United Food & Commercial Workers Intern. Union, Locals 1614 & 368,* 292 NLRB 81, 1988 WL 214277 (1988). This protection of consumer boycott and area standards picketing falls within the plain meaning of the last clause of Section 7, which provides union members the right to engage in concerted activities for "other mutual aid or protection." 29 U.S.C. § 157. The mutual aid or protection clause includes these activities because "a union has a legitimate interest in protecting the wage standards of its members who are employed by competitors of the picketed employer." *Sears, Roebuck & Co.,* 436 U.S. at 206 n. 42, 98 S.Ct. 1745; *see also O'Neil's Markets,* 95 F.3d at 735 n. 1 ("[A] union engages in area standards handbilling to protect the employment standards it has successfully negotiated in a particular geographic area from the unfair competitive advantage that would be enjoyed by an employer whose labor cost package was less than those of employers subject to the area contract standards.") (citation and internal quotation marks omitted).

*Lechmere* does not mandate a contrary result. *Lechmere* addressed the degree of access required for nonemployees' exercise of derivative activities on private property, but it did not alter whether consumer boycott activity in itself is protected by Section 7. *See United Food, Local No. 880,* 74 F.3d at 298–99; *Metropolitan District Council of Philadelphia v. NLRB,* 68 F.3d 71, 73 (3d Cir.1995); *NLRB v. Great Scot,* 39 F.3d 678, 682 (6th Cir.1994).

Moreover, this Court has identified Section 8(b)(7)(C) as the source of the specific right to engage in consumer boycott activity, noting that it "contains a proviso which allows a union to lawfully picket an 'employer for the purpose of truthfully advising the public (including consumers) that the employer does not employ members of, or have a contract with, a labor organization.'" *NLRB v. Musicians Union, AFM Local 6,* 960 F.2d 842, 845 (9th Cir.1992) (quoting Section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C)). We uphold the Board's conclusion that the Union's actions in picketing and handbilling truthfully to inform customers that Respondent did not employ members of a labor organization constituted protected Section 7 conduct.

**B**

■ We next consider whether Respondent's state law property rights encompass an interest which entitle Respondent to exclude Union organizers from the property. When interpreting state law, we are bound by the decisions of a state's highest court. *See Arizona Electric Power Cooperative, Inc. v. Berkeley,* 59 F.3d 988, 991 (9th Cir.1995). "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* (citing *In re Kirkland,* 915 F.2d 1236, 1239 (9th Cir. 1990)).

Article I, section 2 of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsi-

ble for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. art I, § 2. The California Supreme Court has held that its state constitution provides broader free speech rights than does the First Amendment to the Constitution of the United States. *See Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 908, 153 Cal.Rptr. 854, 592 P.2d 341 (Cal.1979), *aff'd* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) ("[A] protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press.") (hereinafter *"Robins"*) (quoting *Wilson v. Superior Court*, 13 Cal.3d 652, 119 Cal. Rptr. 468, 532 P.2d 116 (1975)). This protection is guaranteed not only for the value of expressive activity itself, but also as an "essential attribute of governing ... vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall." *Robins*, 23 Cal.3d at 907–08, 153 Cal.Rptr. 854, 592 P.2d 341 (citing Cal. Const. art. II, §§ 8, 9, and 13).

Against this backdrop, California courts have granted broad protections to the peaceful exercise of free speech rights over property owners' exclusive control of their property. In *Robins*, the California Supreme Court held that "sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Id.* at 910, 153 Cal.Rptr. 854, 592 P.2d 341. The Court recognized that a modern shopping center "to which the public is invited can provide an essential and invaluable forum for exercising [speech and petition] rights," *id.*, from which the owner is not entitled to prohibit publicly expressive activity. Upon granting certiorari, the United States Supreme Court affirmed the power of the states to adopt "individual liberties more expansive than those conferred by the Federal Constitution."

*PruneYard*, 447 U.S. at 81, 100 S.Ct. 2035. That power even included California's decision to remove "one of the essential sticks in the bundle of property rights," the right to exclude others. *Id.* at 82, 100 S.Ct. 2035.

■ Since then, the California courts have recognized that speech is protected not only in "shopping malls" but also on the privately-owned sidewalk of a stand-alone grocery store. *See Lane*, 71 Cal.2d at 878, 79 Cal.Rptr. 729, 457 P.2d 561. In *Lane*, the California Supreme Court held that "when a business establishment invites the public generally to patronize its store and in doing so to traverse a sidewalk opened up for access ·by the public the fact of private ownership of the sidewalk does not operate to strip the members of the public of their rights to exercise First Amendment privileges on the sidewalk at or near the place of entry to the establishment." *Id.* The Court later approved the broader principle that "the location of the store whether it is on the main street of the downtown section of the metropolitan area, in a suburban shopping center or in a parking lot, does not make any difference." *Sears, Roebuck & Co.*, 25 Cal.3d at 332–33, 158 Cal.Rptr. 370, 599 P.2d 676. There, the Court, considering the speech accommodation required on privately-owned sidewalks and parking lots that provide the sole means of ingress and egress to stand-alone retail stores, explained that "[i]f we were to hold the particular sidewalk area to be 'off limits' for the exercise of First Amendment rights in effect we would be saying that by erecting a 'cordon sanitaire' around its store, [the store] has succeeded in immunizing itself from on-the-spot public criticism." *Id.* at 326–27, 158 Cal.Rptr. 370, 599 P.2d 676 (citing *Lane*, 71 Cal.2d at 876, 79 Cal.Rptr. 729, 457 P.2d 561). Thus, California law prohibits owners of shopping malls and general access supermarket stores from excluding speech activity on their private adjacent sidewalks and parking lots.[5]

---

**5.** We reject Respondent's contention that *Lane* is no longer good law due to its reliance

on *Logan Valley*. While Respondent is correct that *Hudgens* overruled *Logan Valley* to

■ An exception, within which Respondent claims to fall, is made for businesses found to be "modest retail establishments." *See Robins,* 23 Cal.3d at 910, 153 Cal.Rptr. 854, 592 P.2d 341 (emphasizing that its holding does not apply to "the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment."). Whether the owner of a small business must open her property to free speech activities or is a "modest retail establishment" exempt from the *PruneYard* doctrine depends on the nature and extent of public invitation to the property, and the nature, purposes, and primary uses of the property. *See Planned Parenthood v. Wilson,* 234 Cal.App.3d 1662, 1671, 286 Cal.Rptr. 427 (1991); *Allred v. Shawley,* 232 Cal.App.3d 1489, 1501, 284 Cal.Rptr. 140 (1991); *Bank of Stockton v. Church of Soldiers of the Cross of Christ of the State of California,* 44 Cal.App.4th 1623, 1629–30, 52 Cal.Rptr.2d 429 (1996). None of these cases support Respondent's claim to the exception.

In *Planned Parenthood,* petitioners were engaged in antiabortion speech, leafleting, and demonstration activity in the private parking lot and driveway of respondent's medical clinic. 234 Cal.App.3d at 1666, 286 Cal.Rptr. 427. The *Planned Parenthood* court rejected petitioners' reliance on *Lane,* and held that a private three-story medical center was "not the functional equivalent of a public place." 234 Cal.App.3d at 1672, 286 Cal.Rptr. 427 (citation omitted). The court concluded that because the clinic offered professional medical services to specific clientele, did not generally invite the public to "congregate, relax, visit, seek out entertainment,

browse and shop for personal, household or general business merchandise," not even pharmaceutical goods, *id.,* and provided parking only for "tenants" and "patients", the center was not devoted to public use in a manner sufficient to confer on that property the constitutional burden to guarantee the right of free expression. *Id.* at 1671, 286 Cal.Rptr. 427. Similarly, *Shawley* held that a medical center could restrain the entry onto its private parking lot of antiabortion protesters engaging in speech and demonstration activities. 232 Cal.App.3d at 1504–05, 284 Cal.Rptr. 140. The *Shawley* court also rejected petitioners' *Lane* argument, noting that whereas a retail store holds out an invitation to the entire buying public, the professional medical center required prior appointments for all of its patients and was not fully open to the local community, nor did it provide services which were essential to all community members as would a large supermarket-type grocery store. *Id.* at 1501, 284 Cal.Rptr. 140. *See also Allred v. Harris,* 14 Cal.App.4th 1386, 1391, 18 Cal. Rptr.2d 530 (1993) (holding that private medical center was not constitutionally compelled to allow access for free speech activity where the center provided services to specific clientele and posted signs reading "Patient Parking Only" in its parking lot); *Feminist Women's Health Center v. Blythe,* 32 Cal.App.4th 1641, 1661, 39 Cal. Rptr.2d 189 (1995) (upholding restriction against antiabortion speech activities in medical center parking lot as permissible limitation on free speech rights).

Thus, in each case, the courts have distinguished supermarket-type stores, which

the extent that the First Amendment no longer protects peaceful picketing exercised in a shopping center, California appellate courts have invoked the California constitution as a source of protection for speech in shopping centers and other public settings. *See Bank of Stockton,* 44 Cal.App.4th at 1627–29, 52 Cal.Rptr.2d 429 (recognizing overruling of *Logan Valley* but reaffirming *Lane* based on California constitutional law); *Feminist Women's Health Center,* 32 Cal.App.4th at 1660, 39 Cal.Rptr.2d 189 (recognizing that despite

*Lloyd* and *Hudgens'*s "more restricted view of First Amendment rights on private property", article I, section 2 of the California Constitution mandates that "free speech activities cannot be prohibited in a large private shopping mall.") (internal citations omitted). In the absence of contrary authority in the California appellate courts, we must predict that the California Supreme Court would render the same holding were the issue presented to it. *See Arizona Electric Power,* 59 F.3d at 991.

invite the public at large to shop and congregate, from medical clinics which do not invite the general public or have other attributes of a public forum. *Planned Parenthood* even implies that the presence of a retail pharmacy in the medical center might have affected its characterization because such a tenant would invite members of the public to shop and generally avail themselves of its merchandise. 234 Cal.App.3d at 1672, 286 Cal.Rptr. 427; *but see Feminist Women's Health Ctr.*, 32 Cal. App.4th at 1661, 39 Cal.Rptr.2d 189 (finding that, given the small size of the building and parking lot at issue, a private medical center that housed a retail pharmacy open to the public fell within the modest retail establishment exception).

In the only non-abortion protest case in this area, *Bank of Stockton*, 44 Cal.App.4th at 1629–30, 52 Cal.Rptr.2d 429, petitioner Church of Soldiers of the Cross of Christ of the State of California sought to solicit donations from a bank's customers on the private sidewalk in between the bank's privately owned parking lot and entrance. The court held that the bank, a two-story single-purpose building, was a modest retail establishment because it did not provide a place for the general public to congregate, because "indeed, security issues would make it undesirable to have the general public, that is, those who do not need to transact business with the Bank, present", and because "generally only those transacting business with the bank were invited to the property." 44 Cal. App.4th at 1630, 52 Cal.Rptr.2d 429. As a result, the court held that the bank was not a public forum as was a shopping center or supermarket-type store, and thus was *not required to accommodate* free speech on its private sidewalk. *Id.* at 1631, 52 Cal.Rptr.2d 429.

The Board found that Respondent is not a modest retail establishment exempt from California's open access principles. The evidence in the record reflects that Respondent operates a large supermarket grocery outlet that is open to the general public for the purpose of browsing and shopping. The nature and extent of public

invitation to the property is broad: the store is prominently located on California Route 111, a major state highway; customers need not make advance appointments to shop; and use of the property is not limited to specific clientele or purposes. Though the parking lot is designated for the use of employees and customers, there is no evidence that a customer who browses the store's merchandise but does not ultimately purchase items is considered a trespasser or is otherwise unwelcome to park and enter for that purpose.

The sole fact that might support Respondent's contention that its property is not unconditionally open to the public is the factually disputed evidence that in the summer of 1995, signs were posted on the property proclaiming: "Trespassers, solicitors or distribution of literature by non-employees is prohibited on this property." Even if true, however, posting a sign does not permit the supermarket owner to avoid his constitutional obligation. *See Robins*, 23 Cal.3d at 902, 153 Cal.Rptr. 854, 592 P.2d 341.

■ Thus, we conclude that the California Supreme Court would hold that "[w]hatever 'modest retail establishment' means, it does not include ... a 'large supermarket-type grocery store.'" *Bank of Stockton*, 44 Cal.App.4th at 1629, 52 Cal.Rptr.2d 429. Our review of the law and the evidence lead us to affirm the Board's determination that Respondent's Indio Grocery Outlet is not a modest retail establishment.

■ Respondent additionally asserts that general state trespass principles entitle him to exclude uninvited visitors. We reject this contention. "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." *Cassinos v. Union Oil Co.*, 14 Cal.App.4th 1770, 1778, 18 Cal.Rptr.2d 574 (1993) (citing *Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal.App.3d 1, 16, 135 Cal.Rptr. 915 (1977)). However, "[a] peaceable entry on land by consent is not actionable." *Civic Western Corp.*, 66 Cal.App.3d at 17, 135

Cal.Rptr. 915 (quoting 4 Witkin, *Summary of California Law* (8th ed.1974) § 351, p. 2612). Contrary to Respondent's argument, *Robins* makes clear that the public character of a shopping center implicitly reflects consent by invitation to the public to come on the property.[6]

### IV

Respondent further argues that our decision in *Sparks Nugget, Inc. v. NLRB*, 968 F.2d 991 (9th Cir.1992), requires us to permit the exclusion of union organizers on Respondent's property. This is an incorrect interpretation of *Sparks Nugget*. In *Sparks Nugget*, we held that, pursuant to *Lechmere*, a Nevada casino owner was entitled to exclude nonemployee union organizers from engaging in picketing and handbilling directed toward customers in the private parking lot adjacent to the casino entrance. We reasoned that the inaccessibility exception did not apply because the target audience consisted of customers who were not isolated on the prop-

erty. *See id.*, 968 F.2d at 998. In holding that *Lechmere* controlled, we did not explicitly address the scope of Sparks Nugget's property right to exclude.

■ *Sparks Nugget* was decided before *Thunder Basin*, however, in which the Supreme Court made clear that an inquiry into the property owner's right to exclude is a threshold determination, and may explain why we failed to plainly speak to the property interests underlying the accommodation question. Nevertheless, were we to explicitly consider Sparks Nugget's property interest under Nevada law, we would conclude that *Lechmere*'s accommodation analysis was properly invoked. Nevada law, unlike that of California, does not extend special protection to free speech interests at the expense of store owner's property interests.[7] Instead, like the Connecticut law that underlay *Lechmere*, Nevada law allowed the casino owner to exclude the union members from its property.[8] As a result, the *Sparks Nugget*

---

**6.** The cases upon which Respondent relies are inapposite, and none support the proposition that free speech activity on privately owned shopping center property constitutes trespass. *See Cassinos*, 14 Cal.App.4th at 1778, 18 Cal. Rptr.2d 574 (unauthorized injection of wastewater onto privately owned mineral estate constitutes trespass); *Civic Western Corp.*, 66 Cal.App.3d at 17, 135 Cal.Rptr. 915 (cause of action for trespass is stated where debtor alleges that creditor may have exceeded consent conferred by security agreements in entering debtor's property to secure collateral); *Bauman v. Beaujean*, 244 Cal.App.2d 384, 389, 53 Cal.Rptr. 55 (1966) (trespass occurred when three year old child entered neighbor's residential backyard without invitation); *United States v. Imperial Irrigation District*, 799 F.Supp. 1052, 1059 (S.D.Cal.1992) (United States government trespassed on Native American lands by flooding irrigation districts). It is clear that the state constitutional protection of free speech prohibits Respondent from excluding individuals engaged in speech activity pursuant to state trespass laws.

**7.** The Nevada Supreme Court has not construed its state constitutional free speech provision, article I, section 9 of the Nevada Constitution, in the context of accommodation of speech on private property. Its only deci-

sions addressing accommodation principles among speech and property rights have relied equally upon the First Amendment and the Nevada Constitution without distinguishing between them. *See Culinary Workers Union, Local No. 226 v. Eighth Judicial District Court*, 66 Nev. 166, 207 P.2d 990, 993 (1949) (stating that peaceful picketing was protected by the Constitutions of the United States and of the State of Nevada); *City of Reno v. Second Judicial District Court*, 59 Nev. 416, 95 P.2d 994 (1939) (holding that city ordinance that banned peaceful picketing violated federal and state constitutional free speech guarantees); *see also Venetian Casino Resort v. Local Joint Executive Board of Las Vegas*, 45 F.Supp.2d 1027 (D.Nev.1999) (holding that privately owned sidewalk in front of casino and connected on either side to public sidewalk constituted public forum for purposes of the First Amendment to the United States Constitution). The *Venetian* court recognized plaintiff's claim that Nevada law provides no greater protection for free speech rights on private property than does the United States Constitution, but declined to rule on the basis of Nevada Constitutional law. *See* 45 F.Supp.2d at 1034 n. 4.

**8.** Moreover, Nevada state law restricts picketing during the pendency of a labor dispute, *see* Nev.Rev.Stat. § 614.160 ("it is unlawful

court properly invoked *Lechmere*'s accommodation principles notwithstanding its lack of an express discussion of Nevada property interests.

Because California and Nevada property law are materially different, *Sparks Nugget* does not control the accommodation analysis to be applied to California shopping mall and supermarket owners, as that result would restrict access of protected Section 7 activity where California state constitutional law guarantees that no other free speech may be restricted. Such a result is not the import of *Lechmere, Sparks Nugget,* or Section 7 of the NLRA. *See Thunder Basin Coal Co.,* 510 U.S. at 217 n. 21, 114 S.Ct. 771.

Respondent additionally argues that *Sparks Nugget* protects its right to exclude the Union representatives on the ground that it distinguishes between direct and derivative Section 7 activity. We reject this claim. *Sparks Nugget* holds that *Lechmere*'s inaccessibility exception, permitting nonemployee union representatives to come on private property only when necessary to reach employees, is not applicable in the context of reaching consumers because consumers are not isolated on company property. 968 F.2d at 997–98. However, even though *Sparks Nugget* limits the inaccessibility exception, the inapplicability of the exception does not matter where, as here, the general rule of *Lechmere* does not apply.

## V

Finally, Respondent argues that the need for a uniform, national labor law precludes Section 7 rights from being defined by individual state trespass laws. Because we accord deference to Board's interpretation of the NLRA, we lastly consider whether the Board's determination that accommodation of Section 7 activity depends in the first instance on an employer's state property rights is rational and consistent with the Act.

One purpose of Section 7 is to guarantee employees' rights to engage in concerted activities for "mutual aid or protection." 29 U.S.C. § 157. As discussed in Part II, Section 7 activity is subject to widely disparate accommodation on private property depending on the state in which the activity is exercised. To the extent that state law permits employers' exclusion of Section 7 conduct, the NLRA does not mandate accommodation. *See Thunder Basin Coal,* 510 U.S. at 217 n. 21, 114 S.Ct. 771. To the extent that state law requires accommodation, the NLRA does not mandate exclusion. *See id.* Our holding today falls into the latter category, protecting Section 7 activity under the ambit of California constitutional law where *Lechmere* indicates it would not be protected by the NLRA alone.

A principal concern over "state interference with federally protected conduct" is the risk that the state will misinterpret the federal law, resulting in the "prohibition of protected conduct." *Sears, Roebuck & Co.,* 436 U.S. at 203, 98 S.Ct. 1745. In this case, *Lechmere* has already delineated the circumstances in which a state may prohibit protected conduct, that is in almost all circumstances in which its trespass law guarantees employers the right to exclude. State trespass law that does not guarantee the right to exclude causes no conflict, in that it does not prohibit federally protected conduct; instead, such law grants broader accommodation of protected conduct than is required by the federal labor

for any person to picket on private property without the written permission of the owner ... *even if* the private property is open to the public as invitees for business.") (emphasis added); unlike California law, which recognizes a labor exception to California's criminal trespass laws. *See* Cal. Ann. Penal Code § 522.1(a) (West 1999). We recognize that the Nevada provision has not been construed by the Nevada courts and accordingly does not assist us in determining the Nevada Supreme Court's construction of the state law. *See Venetian Casino Resort,* 45 F.Supp.2d at 1034 n. 4. However, it is at least appreciable to note that in explicitly elevating property rights over labor rights, the Nevada statute stands in direct contrast to the California statute.

law. Thus, where California mandates that its shopping center owners grant access to those engaged in expressive activity, "the requisite accommodation has taken place." *See Lechmere*, 502 U.S. at 538, 112 S.Ct. 841.

■ We find no reason to believe that California's provision of additional access conflicts with the federal scheme. As one prescient commentator noted: "If states choose to modify their property laws, and to subtract from the owner's bundle of property entitlements, the federal interest in access then pushes against an open door. There is no federal justification for barring states from allowing access when the only reason federal law did not provide the access was a deference to supposed state law opposing it." Michael H. Gottesman, *Rethinking Labor Law Preemption: State Laws Facilitating Unionization*, 7 YALE J. ON REG. 355, 417 (Summer 1990). This analysis fully accords with NLRA preemption principles.[9] "The NLRA contains no express preemption provision." *Building and Construction Trades Council v. Associated Builders and Contractors*, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). State regulation of activities protected by Section 7 of the NLRA should not be preempted "unless [the state regulation] conflicts with federal law or would frustrate the federal scheme, or unless [we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Id.* (citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747–48, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). The Court is "reluctant to infer preemption." *Id.* (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). "Consideration under the Supremacy Clause starts with the basic assumption that Con-

gress did not intend to displace state law." *Id.* (citing *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).

In this case, allowing state law to provide greater accommodation of Section 7 activity does not conflict with the NLRA because it does not "set forth standards of conduct inconsistent with the substantive requirements of the NLRA." *See id.* at 225, 113 S.Ct. 1190 (citing *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). Because the Board's rule grants more accommodation to the Union than is required by federal law, without interfering with protected conduct, we conclude that it is a rational and permissible construction of the Act, and therefore find no reason to disturb it.

## CONCLUSION

We uphold the Board's rule, that in cases in which the exercise of Section 7 rights by nonemployee Union representatives is assertedly in conflict with a respondent's private property rights, the respondent bears a threshold burden to establish that it had, at the time it expelled the Union representatives, an interest which entitled it to exclude individuals from the property. We also uphold the Board's finding that the Indio Grocery Outlet was not a modest retail establishment, and its conclusion that under California law Respondent had no right to exclude the public from the property. We further uphold the Board's findings in this case, that the Union was engaged in conduct protected by Section 7 of the Act. Therefore, we GRANT enforcement of the Board's order concluding that Respondent's interference with the Union's protected conduct consti-

9. Certainly, California's constitutional and common law guarantees of free speech are not a "regulation" *per se* subject to traditional preemption analysis. *See Building and Construction Trades Council*, 507 U.S. at 227, 113 S.Ct. 1190 ("pre-emption doctrines apply only to state regulations"). However, to the extent

that California law affects the zone protected by the NLRA, analysis of the hierarchy of state and federal law in this area is helpful to determine whether the rule incorporating state law is consistent with the Act. *See id.* ("A state does not regulate ... simply by acting within one of these protected areas.").

tuted a violation of Section 8(a)(1) of the NLRA.

**ORDER ENFORCED.**