GLENDALE ASSOCIATES, LTD.; Glendale II Associates Limited Partnership; Donahue Schriber, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

National Labor Relations Board, Petitioner,

v.

Glendale Associates, Ltd.; Glendale II Associates Limited Partnership; Donahue Schriber, Respondents.

Nos. 01–71566, 01–71746.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2002.

Filed Oct. 30, 2003.

Thomas J. Leanse (argued) and Karen L. Stephenson (briefed), Katten, Muchin & Zavis, Los Angeles, CA, for the petitioners-respondents.

Robert J. Englehart, National Labor Relations Board, Washington, D.C., for the respondent-petitioner.

Before PREGERSON, NOONAN, and TASHIMA, Circuit Judges.

PREGERSON, Circuit Judge.

In the spring of 1997, Local 57 of the National Association of Broadcast Employees and Technicians, the Broadcasting and Cable Television Workers Sector of the Communication Workers of America ("Union" or "Local 57") and the American Broadcasting Company, Inc. ("ABC") were engaged in a contract dispute. To pressure ABC to settle the dispute, union representatives from Local 57 distributed handbills to customers outside of the Disney Store in the Glendale Galleria ("Galleria"). The Union targeted the Disney Store because it is owned by Disney Enterprises, Inc. ("Disney Enterprises"), the same parent company that owns ABC. The handbills the Union distributed outside the Disney Store informed customers of ABC's and Disney Enterprises' anti-worker policies and encouraged customers to express their concerns about Disney Enterprises' corporate practices to Disney's corporate headquarters and to Congress.

Petitioners co-own and manage the Galleria. Shortly after the Union began handbilling at the Galleria, Petitioners requested that the Union comply with their rules regarding distributing written materials on their premises. Relevant to this appeal, Petitioners requested that the Union remove Disney's name from the handbill pursuant to the Galleria's policy prohibiting certain groups from distributing on its premises written materials that name a Galleria tenant, owner, or manager. The Union refused to remove Disney's name from its handbill. Petitioners then requested that the union representatives leave its premises for failure to comply

with the rule prohibiting the distribution of written material that names a mall tenant. Petitioners informed the Union members that if they did not leave the Galleria premises, the union representatives would be arrested for trespassing on private property.

The Union subsequently filed an unfair labor practice charge against Petitioners under § 8(a)(1), 29 U.S.C. § 158(a)(1), of the National Labor Relations Act ("NLRA"). An Administrative Law Judge ("ALJ") found that Petitioners violated § 8(a)(1) by promulgating, maintaining, and enforcing a rule prohibiting union representatives from distributing literature on Galleria premises that identifies by name a Galleria tenant, owner, or manager.

The National Labor Relations Board ("the Board") affirmed the ALJ's decision and ordered that Petitioners cease and desist from maintaining and enforcing a rule "prohibiting handbilling or other expressive activities protected by Section 7 of the NLRA which identify by name the center owner, manager, or any tenant in the center."

The Galleria petitions for review of the Board's order, and the Board cross-petitions for enforcement of the Board's order. We affirm the Board's decision, and hold that Petitioners violated § 8(a)(1) of the NLRA by prohibiting the union representatives from naming a Glendale tenant in the handbills they distributed on Petitioner's property. We, therefore, enforce the Board's order.

### FACTS

Petitioners Glendale Associates, Ltd. and Glendale II Associates, both California partnerships, co-own a large retail shopping center known as the "Glendale Galleria" in Glendale, California.[1] They employ petitioner Donahue Schriber, a management company based in Newport Beach, California to manage the operations of the Galleria. Petitioners are employers as defined by the NLRA. *Glendale Associates,* 335 NLRB at *6.

The Galleria consists of more than 1.3 million square feet. It contains five major department stores and 60 other stores and has thirteen entrances. At each entrance, a sign welcomes customers and announces a general ban on bicycles, radios, roller skates, and soliciting. The Galleria employs 40–45 security officers, with about ten to twelve officers working on the property at any time.

One of the tenants of the Galleria is the Disney Store, Inc. The Disney Store is a separately incorporated, wholly owned, subsidiary of Disney Enterprises. Disney Enterprises also owns ABC, formally known as Capitol Cities/ABC, Inc. Disney Enterprises, in turn, is a wholly owned subsidiary of the Walt Disney Company.

Local 57 represents a bargaining unit that includes tape editors who work for ABC. At the expiration of the parties' last collective bargaining agreement, on March 31, 1997, ABC and the Union failed to reach agreement on the terms of a new collective bargaining agreement. To pressure ABC to negotiate a new agreement, on May 10, 1997, the president of Local 57, Gina Stinett, and several Local 57 members (collectively "union representatives") distributed handbills inside the Galleria near the Disney Store. None of the union representatives distributing handbills was employed by the Disney Store. The hand-

---

1. Orbach Associates co-owns the Galleria with the petitioners. Orbach, however, is not a party to this suit because it is not an employer as defined by NLRA. NLRA § 2(2), (6), (7), 29 U.S.C. § 152(2), (6), (7). *Glendale*

*Assocs., Ltd., Nat'l Ass'n of Broad. Employees and Technicians, the Broad. and Cable Television Workers Sector of the Communication Workers of Am.,* 335 NLRB 8, 2001 WL 986870 at *6 (2001).

bills informed customers of ABC's demand for take-backs from workers during negotiations with the Union, including ABC's proposed elimination of company pension contributions. In addition, the handbill included information on Disney's sweatshop violations in Haiti, child labor practices in Los Angeles, and tax loophole practices. The handbill encouraged customers to express their concern about Disney's employment policies to the Disney corporate headquarters, the Disney Store manager, and Congress.[2]

After Local 57 began handbilling in front of the Disney Store, the Galleria's director of security, Michael Cross, approached the union representatives. Cross instructed the union representatives that they had to comply with the Galleria's rules regulating handbilling. Cross gave the Union an application and a full set of the Galleria's rules for distributing litera-

ture. On June 2, 1997, the Union submitted its application to the Galleria. The Galleria subsequently gave the Union permission to handbill on June 7, 1997, subject to curing certain deficiencies in the application. Specifically, the Galleria required the Union (1) to explicitly identify the names of those expected to participate in the handbilling effort, and (2) to remove the reference to the Disney Store from the handbills pursuant to a Galleria policy that bars certain groups from naming a Galleria owner, manager, or tenant on noncommercial materials that was distributed on its premises. Petitioners do not apply their rule barring groups from naming a Galleria owner, manager, or tenant to persons or groups engaged in a *primary* dispute with a Galleria tenant. Nor do Petitioners apply the rule to persons or groups distributing commercial literature on its premises.

2. The full text of the handbill stated:
Hey Mouseketeers!
Before you shop in the Disney store, you should know what Disney is doing with your money:
Disney heaps millions of taxpayer dollars on CEO Michael Eisner . . .
Disney is taking advantage of a tax loophole to avoid paying $600 million in taxes owed on the sale of its newspaper holdings. Congress is trying to close the loophole, but Disney is working hard to complete the sale before Congress acts. That $600 million translates to $5 per taxpayer.
What will Disney do with its corporate welfare windfall? Disney awarded CEO Michael Eisner a ten-year employment contract with a projected value in excess of $900 million—the largest payout to a CEO in American corporate history.
. . . [W]hile exploiting workers in the U.S. and abroad.
•• In the past year, Disney manufacturing shops in the U.S. have been cited by the U.S. Labor Department for sweatshop violations.
•• A 12–year–old girl was found working in a Los Angeles factory that manufactures Disney products.

•• Workers in Haiti earn only 28 cents an hour making Disney clothes. A Disney contractor in Thailand was found exploiting 13– and 14–year old children to sew Disney clothes.
•• In negotiations at its ABC subsidiary. Disney is demanding take-backs from workers, including the elimination of company pension contributions. Disney wants to diminish the number of Union jobs and transfer the work to non-union workers.
WHAT YOU CAN DO
1. Ask the Disney store manager to call Disney corporate offices at 818–553–7200 to register your concern about their employment policies.
2. Sign the card to Members of Congress telling them that you want them to stop corporate welfare for Disney.
3. Explain to your children that Disney does not live up to its family-friendly image and is not nice to children; that's why they should buy their toys elsewhere next time. Demand that Congress close the Disney–Eisner salary subsidy tax loophole
*Glendale Associates,* 2001 WL 986870 * 8–9.

The Union completed the Galleria's application and returned it to Petitioners. The Union complied with the Galleria's request to name the handbillers. But the Union declined to remove the reference to the Disney Store from the handbills. On June 7, 1999, union representatives returned to the Galleria to distribute handbills in front of the Disney Store. Cross, upon noting that the Union had not removed the Disney Store's name from its handbills, ordered the Union to leave the Galleria premises. Cross informed the Union that if they did not leave, they would be subject to arrest for illegal trespass on private property. Undeterred, the union representatives continued distributing the handbills outside of the Disney Store. Petitioners did not contact police officials. The Union filed an unfair labor practice charge against Petitioners with the Board.

## ADMINISTRATIVE PROCEEDINGS

On March 4, 1999, an ALJ held that Petitioners violated Section 8(a)(1) of the NLRA by promulgating, maintaining, and enforcing, by threats to call the police, a rule prohibiting the naming of a Galleria tenant on its premises. The ALJ found that Petitioners' rule was "a content-based restriction prohibited both by the First Amendment and by Section 7 of the Act." *Glendale Associates*, 335 NLRB at *16. The ALJ thus ordered Petitioners to cease and desist from maintaining and enforcing their rule prohibiting expressive activities which identify the name of the center owner, manager, or tenant of the mall. In addition, the ALJ held that Petitioners were not in violation of the NLRA by requiring the Union to supply the names of individuals who would be handbilling on its premises.

On appeal, the Board adopted the decision of the ALJ. The Board first observed that under *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), an employer may lawfully bar nonemployee Union organizers from private property unless employees are inaccessible to the Union. *Glendale Associates*, 35 NLRB 8, 2001 WL 986870 at *4 n. 5. The Board held, however, that where an employer does not have a private property interest to exclude nonemployee Union organizers from its premises, the Court's holding in *Lechmere* does not apply to the case. *Id.* Because the Board found that the Galleria's rule prohibiting the distribution of literature that names a Galleria tenant, owner or manager is an impermissible content-based restriction under California law, the Board held that the Galleria did not have a sufficient property interest to exclude the Union from its premises. Thus, the Board concluded that Petitioners "violated Section 8(a)(1) [of the NLRA] by maintaining a rule prohibiting activities which identify by name the center owner, manager, or any tenant of the center and by threatening to call the police to enforce that rule." *Id.* Accordingly, the Board ordered Petitioners to cease and desist from the unfair labor practice found, and from interfering with the exercise of the Union's rights protected by Section 7 of the NLRA. The Board, however, held that Petitioners did not violate the NLRA by requiring the Union to identify the handbillers by name in advance of handbilling. This policy, the Board found, was a valid time, place, and manner restriction consistent with California law.

The Galleria appealed from the Board's finding that it violated § 8(a)(1) of the NLRA and timely filed a Petition For Review with this Court. The Board filed a cross-petition for enforcement of its order.

## STANDARD OF REVIEW

The National Labor Relations Board "has the primary responsibility for developing and applying national labor policy." *NLRB v. Calkins*, 187 F.3d 1080, 1085 (9th

Cir.1999) (citing *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990)). So long as the Board's interpretation is "rational and consistent" with the statute, its rulings are afforded "considerable deference." *Id.* The Board's order will be upheld on appeal if it correctly applied the law and its factual findings are supported by substantial evidence. *Id.; Retlaw Broad. Co. v. NLRB*, 172 F.3d 660, 664 (9th Cir.1999).

## DISCUSSION

Petitioners contend that the Board misapplied *Lechmere*, 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79, to this case. They argue that under *Lechmere*, the NLRA does not prohibit Petitioners from excluding union representatives from its property for failure to comply with the Galleria's rules. The Board, in response, contends that *Lechmere* does not apply to situations where an employer restricts union representatives pursuant to a rule that violates state law. Under our decision in *Calkins*, 187 F.3d 1080, we agree with the Board and enforce its order.

### A.

In *Lechmere*, the Supreme Court examined the scope of Section 7 protections for nonemployee union organizers, i.e., union representatives and members who are not directly employed by the employer against whom the union representatives are directing their union activity. In *Lechmere*, the Court considered the case of nonemployee union representatives who were engaged in a campaign to organize Lechmere employees. As part of the Union's campaign, union representatives distributed informational union literature to Lechmere employees in Lechmere's employee-used parking lot. Lechmere personnel confronted the union representatives and barred them from all solicitation efforts on its premises. The Union complied, but

filed an unfair labor practice contending that Lechmere violated the NLRA by barring union representatives from its property. The ALJ found, and the Board agreed, that the nonemployee union representatives were engaged in protected Section 7 activities and that Lechmere committed an unfair labor practice under 8(a)(1) by excluding the union representatives from its property. The First Circuit enforced the Board's order. 914 F.2d 313 (1st Cir.1990), *rev'd, Lechmere*, 502 U.S. at 541, 112 S.Ct. 841.

The Supreme Court reversed. The Court acknowledged the rule under *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), that "an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution." 351 U.S. at 112, 76 S.Ct. 679; *see Lechmere*, 502 U.S. at 538, 112 S.Ct. 841. The Court held that the Union had reasonable access to employees because it could display pro-Union signs outside the employee parking lot. Thus, the Court concluded that Lechmere's exclusion of the Union did not violate the NLRA. *Id.* at 540, 112 S.Ct. 841.

Since *Lechmere* was decided, this Court, along with other Circuits and the Board, have found *Lechmere* to be inapplicable to cases where an employer excluded nonemployee union representatives in the absence of a state property right to do so. *See, e.g., Calkins*, 187 F.3d 1080; *United Food & Commercial Workers Int'l Union, Local 400 v. NLRB*, 222 F.3d 1030 (D.C.Cir.2000); *O'Neil's Mkts. Inc. d/b/a Food for Less, United Food & Commercial Workers Union, Meatcutters Local 88*, 318 NLRB 646 (1995) *enforced* (in relevant

part) *by O'Neil's Mkts., United Food and Commercial Workers Union, Meatcutters Local 88*, 95 F.3d 733 (8th Cir.1996); *Bristol Farms, United Food and Commercial Workers Int'l Union, Local 1442*, 311 NLRB 437 (1993). An employer's state property right controls whether an employer may ban nonemployee union representatives because "state property law is what creates the interest entitling employers to exclude organizers in the first instance. Where state law does not create such an interest, access may not be restricted consistent with Section 8(a)(1) [of the NLRA]." *Calkins*, 187 F.3d at 1088; *see also Bristol Farms*, 311 NLRB at 438 ("[A]lthough employers' property rights must be given appropriate respect, an employer need not be accorded any greater property interest than it actually possesses.").

In *Calkins*, the owner of the Indio Grocery Outlet prohibited nonemployee union representatives from distributing on its parking lots and sidewalks handbills that encouraged customers to boycott the store because it was non-Union. The Union filed an unfair labor practice complaint with the Board. The Board first held that the Union had been engaging in protected Section 7 activity. *Calkins d/b/a Indio Grocery Outlet*, 323 N.L.R.B. 1138, 1142, 323 N.L.R.B. No. 196, 1997 WL 397549 at *7. Furthermore, the Board found that Indio Grocery Outlet committed an unfair labor practice under NLRA § 8(a)(1) by threatening to have union representatives arrested if they did not leave Indio Grocery Outlet's premises. *Id.* *Lechmere*, the Board held, did not apply to this case because Indio Grocery Outlet did not have a property interest under state law to exclude the organizers; California's free speech protections prohibited Indio Grocery Outlet from barring the organizers from distributing literature. *Id.*

We enforced the Board's order. *Calkins*, 187 F.3d at 1088. We emphasized that *Lechmere* did not hold that the *NLRA* allows employers to categorically bar nonemployee union representatives from its premises. Rather, as the Supreme Court later explained in *Thunder Basin Coal v. Reich*, "[t]he right of employers to exclude union organizers from their private property emanates from *state common law*, and while this right is not superseded by the NLRA, nothing in the NLRA expressly protects it." 510 U.S. 200, 217 n. 21, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (cited in *Calkins*, 187 F.3d at 1088) (emphasis added). Put differently, the Court in *Thunder Basin Coal* "explain[ed] that employers may exclude union organizers in deference to state common law but not because the NLRA itself restricts access." *Calkins*, 187 F.3d at 1088–89. Thus, we held that "when an employer lacks an interest entitling it to exclude individuals engaged in Section 7 conduct, *Lechmere's* accommodation analysis is not triggered."[3] *Id.* at 1088.

---

**3.** The Eighth Circuit came to the same conclusion in *O'Neil's Markets*. *O'Neil's Markets*, 318 NLRB 646 *enforced* (in relevant part) *by O'Neil's Markets*, 95 F.3d 733. In *O'Neil's Markets*, the Eighth Circuit held that a non Union grocery store employer committed an unfair labor practice when it excluded nonemployee Union organizers from picketing and leafleting in front of the grocery store. The Eighth Circuit found that *Lechmere* did not absolve O'Neil's of its violation under the NLRA because O'Neil's easement rights in the areas where the Union was picketing were *nonexclusive*. Under Missouri state law, O'Neil's property interest in the areas where union representatives were picketing did not provide the store with a sufficient property right to exclude the union representatives. *O'Neil's Mkts.*, 95 F.3d at 738 ("Where, as here, an employer lacks the right to exclude others from the property involved in the complaint, the Board has consistently held that the principles announced in *Babcock* and *Lechmere* do not apply.... Those principles apply only when a property right is sufficient to permit the exclusion of others and Section

To determine whether the Indio Grocery Outlet acted in violation of the NLRA by excluding the Union picketers we examined "first, whether the Union members engaged in Section 7 activity; and second whether [Indio Grocery Outlet] possessed a property interest under California law entitling it to exclude that activity." *Id.* We held that the Union's picketing activity in front of Indio Grocery Outlet was protected under the NLRA because "Section 7 [of the NLRA ] protects nonemployees engaging in picketing or other publicity for the purpose of truthfully advising the public that an employer does not employ Union members or have a contract with a labor organization." *Id.* at 1089.

Turning to whether Indio Grocery Outlet had a state property right to exclude the Union, we looked to California state law. After examining California state court decisions, we concluded that Indio Grocery Outlet did not have a right to exclude the Union from its property under California free speech protections. Specifically, we held that Indio Grocery Outlet's policy was in violation of Article 1, section 2 of the California Constitution, which "prohibits owners of shopping malls and general access stores from excluding speech activity on their private adjacent sidewalks and parking lots." *Id.* at 1090. Thus, we affirmed the Board's order.

### B.

■ We hold, and Petitioners do not contest, that the Union was engaged in protected Section 7 activity when they distributed handbills outside the Disney Store. Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organiza-

tions." 29 U.S.C. § 157. An employer violates the NLRA if it "interfere[s] with, restrain[s], or coerce[s] employees" in the exercise of their Section 7 rights. 29 U.S.C. § 158(a)(1). Section 7 protects the right of employees "to improve terms and conditions of employment ... through channels outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB,* 437 U.S. 556, 565, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). Relevant to this case, Section 7 protects Union members and representatives that engage in activities to pressure their employer during a labor dispute, even when picketing a sister company owned by the same parent company. *See, e.g., Sears, Roebuck & Co. v. San Diego County Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *Calkins,* 187 F.3d at 1086–87.

### C.

■ The heart of this appeal turns on whether Petitioners had the state property right to exclude union representatives from naming a Galleria tenant on handbills the union representatives distributed on the Galleria premises. Thus, we examine whether Petitioners' rule is consistent with California free speech protections under the California Constitution. Petitioners argue that their rule is consistent with California law because they have a substantial interest in ensuring that neither their, nor their tenants', normal business operations are disrupted. Alternatively, Petitioners argue that their rule is a valid time, place, and manner regulation. The Board contends that Petitioners' rule is an impermissible content-based restriction that violates Article 1, section 2 of the

7 rights exist."). *See also United Food and Commercial Workers Int'l Union, Local 400,* 222 F.3d at 1038 (holding that employer's exclusion of Union organizers who were boycotting four stores on the store's front side-

walks violated the organizers' Section 7 rights, and that *Lechmere* did not apply because the employer had no ownership interest in the sidewalks under state law).

California Constitution. Thus, the Board argues that Petitioners had no lawful right to prevent the Union from distributing a handbill that contained protected speech. We agree with the Board, and hold that Petitioners did not have a sufficient property interest to exclude the union representatives from distributing handbills that name a Galleria tenant, manager, or owner. We hold that Petitioners' rule violates the Union's free speech protections guaranteed by Article 1, section 2 of the California Constitution.

■ In analyzing questions of state law, we are bound by the decisions of the state's highest court. *Calkins*, 187 F.3d at 1089 (citing *Ariz. Elec. Power Coop., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995)). When the state's highest court has not squarely addressed an issue, we must "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treaties and restatements for guidance." *Id.*

**1.**

Article 1, section 2 of the California Constitution guarantees that "[e]very person may freely speak, write and publish his or her sentiments on all subjects." Cal. Const. art. I, § 2. The California Supreme Court has *recognized* that the California Constitution is "more protective, definitive and inclusive of rights to expression and speech" than the First Amendment to the United States Constitution. *Robins v. Pruneyard Shopping Ctr.*, 23

Cal.3d 899, 908, 910, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), *aff'd*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).[4]

■ As part of California's broader free speech protections, privately-owned shopping centers are required to respect individual free speech rights on their premises to the same extent that government entities are bound to observe state and federal free speech rights. *Pruneyard*, 23 Cal.3d at 911, 153 Cal.Rptr. 854, 592 P.2d 341. The California Supreme Court made this rule clear in its landmark *Pruneyard* case. In *Pruneyard*, the California Supreme Court held that Pruneyard Shopping Center, by not permitting students to collect signatures for a political petition on its property, violated the students' free speech rights protected by the California Constitution. The California Constitution protects free speech rights in large shopping centers, the court held, because private property is held subject to the "power of the government to regulate its use for the public welfare." *Pruneyard*, 23 Cal.3d at 900–01, 153 Cal.Rptr. 854, 592 P.2d 341 Under the California Constitution, "property rights must yield to the public interest. . . . The rights preserved to individual private property owners by various constitutional provisions are held in subordination to the rights in society." *Id.* In addition, free speech rights in shopping centers are protected because large shopping centers have replaced city centers as public gathering places for citizens. Also, the court observed, shopping malls act like a

---

**4.** California's expansive free speech protections are grounded in the state's unique emphasis on direct popular democratic endeavors. *See, e.g., Pruneyard*, 23 Cal.3d at 907–08, 153 Cal.Rptr. 854, 592 P.2d 341 ("That [free speech] right in California is, moreover, vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall."); *U.C. Nuclear Weapons Labs Conver-* *sion Project v. Lawrence Livermore Lab.*, 154 Cal.App.3d 1157, 1163–64, 201 Cal.Rptr. 837 (1984) ("The right of free speech in this state is a vigorous one, largely because of the obligation and the right of our citizens to be actively involved in government through the processes of initiative, referendum and recall which distinguish our state constitutional system.").

public forum because malls openly invite the public both to shop and congregate on its premises. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) ("The California Constitution broadly proclaims speech and petition rights. Shopping centers to which the public is invited can provide an essential and invaluable forum for exercising those rights.").

### 2.

■ To analyze whether Petitioners' rule prohibiting the distribution of literature that names a Galleria tenant, owner, or manager, is valid under the California Constitution, we must first determine whether the rule is content-neutral or content-based. *Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal.4th 352, 364–65, 93 Cal.Rptr.2d 1, 993 P.2d 334 (2000). California state courts borrow from federal First Amendment jurisprudence to analyze whether a rule is content-based or content-neutral. *Id.* at 364, 93 Cal.Rptr.2d 1, 993 P.2d 334; *Savage v. Trammell Crow Co.,* 223 Cal.App.3d 1562, 273 Cal.Rptr. 302 (1990). Content-based regulations receive strict scrutiny because "content-based restrictions are especially likely to be improper attempts to value some forms of speech over others, or are particularly susceptible to being used by the government to distort public debate." *City of Ladue v. Gilleo,* 512 U.S. 43, 60, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (O'Connor, J., concurring). We hold that Petitioners' rule restricting expressive activity that names a Galleria tenant, owner, or manager is a content-based restriction on speech and fails to survive strict scrutiny.

■ A rule is content-neutral if it is "unconcerned with the literal content of the spoken or written words." *Los Angeles Alliance for Survival,* 22 Cal.4th at 368, 93 Cal.Rptr.2d 1, 993 P.2d 334; *see also*

*Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (A restriction on speech is content-neutral if it is "justified without reference to the content of the regulated speech."). California courts and the United States Supreme Court thus hold that speech-regulating rules are content-neutral when the rule is not related to the subject or topic of the speech. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (New York City law regulating permissible level of noise in Central Park is content-neutral because it is justified without content of speech); *Los Angeles Alliance for Survival,* 22 Cal.4th at 380, 93 Cal.Rptr.2d 1, 993 P.2d 334 (Los Angeles' ban on aggressive solicitation for immediate monies is content-neutral); *Savage,* 223 Cal.App.3d 1562, 273 Cal.Rptr. 302 (shopping center's rule banning distribution of all literature in its parking lot is content neutral because it is without reference to subject matter).

■ In contrast, "[a]s a general rule, laws that by their terms distinguish favored from disfavored speech on the basis of the ideas or views expressed are content based." *Crawford v. Lungren,* 96 F.3d 380, 384 (9th Cir.1996) (quoting *Turner Broad. Sys. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). A rule is defined as a content-based restriction on speech when the regulating party must examine the speech to determine if it is acceptable. *Desert Outdoor Adver. v. City of Moreno Valley,* 103 F.3d 814, 820 (9th Cir.1996). In addition, courts consider a rule content-based when it establishes a general ban on speech, but maintains exceptions for speech on certain subjects. *Gilleo,* 512 U.S. at 60, 114 S.Ct. 2038 (city's ordinance regulating signs on private property is content-based because it had ten exceptions to the rule); *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S.

410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (ordinance banning commercial handbills on news racks but allowing newspapers is content-based); *Foti v. City of Menlo Park,* 146 F.3d 629 (9th Cir.1998) (Menlo Park's regulation banning posting of signs on public property except for real estate, governmental, and safety and traffic signs is content-based).

Petitioners' rule restricting certain groups from engaging in non-commercial speech that includes the name of a tenant, owner, or manager is similarly content-based. Like the regulation at issue in *Gilleo,* the Galleria must review the literature to determine if it includes a tenant, owner, or management's name before it will approve the literature for distribution. In addition, Petitioners except from its rule groups or persons distributing the literature who are in a *primary* labor dispute with a Galleria tenant. And, Petitioners except from its rule persons or groups who distribute *commercial* literature on its premises naming a Galleria tenant, owner, or manager. Petitioners' rule goes to the underpinnings of content-based free speech protections because it is prohibiting speech that is counter to their, and their tenants, interests.

### 3.

■ California courts also draw from First Amendment jurisprudence to determine whether a content-based rule survives scrutiny under the California Constitution. *City of Fresno v. Press Communications, Inc.,* 31 Cal.App.4th 32, 39, 36 Cal.Rptr.2d 456 (1994), *Walker v. Kiousis,* 93 Cal.App.4th 1432, 1446, 114 Cal.Rptr.2d 69 (2001). Content-based regulations are presumptively unconstitutional. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). A content-based restriction on

speech will pass constitutional muster only if it employs the least restrictive means to further a compelling interest. *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). A content-based rule is unconstitutional "[a]bsent a demonstrably content-neutral basis for selectively restricting [this speech] to the exclusion of other categories of speech." *Press Communications,* 31 Cal.App.4th at 40, 36 Cal. Rptr.2d 456. The burden is on Petitioners to prove that the restriction is justified without reference to the content of the regulated speech. *Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. 2746.

■ Petitioners argue that their rule banning the naming of a tenant, owner, or manager in literature distributed on their premises protects the Galleria's valid interest of ensuring that its normal business operations are not disrupted. Petitioners contend that if they did not prohibit non-commercial literature that discloses a tenant's name, it would affect their tenant's investment in Petitioners' property because it would discourage the public from patronizing the named tenants. The Board argues that Petitioners' argument is misplaced because it relies on case law addressing content-neutral rules, which are subject to a lower standard of scrutiny. Moreover, the Board contends that Petitioners' exemption of primary labor disputants from their rule undermines their stated concern of disruption with business. Again, we agree with the Board and hold that Petitioners' rule violates the free speech rights guaranteed by the California Constitution.

The California Supreme Court has yet squarely to address whether such a rule promulgated for Petitioners' purpose—protection against disruption of businesses—can withstand strict scrutiny.[5]

---

**5.** When the California Court of Appeal considered a similar issue of a mall requiring content-checked approval of Union signs, the court observed that the rule "raises intriguing

But California and federal courts have invalidated content-based rules as unconstitutional when rules contain exceptions, and those exceptions implicate the same interests that motivates the restriction on the regulated content. *Gilleo,* 512 U.S. at 52, 114 S.Ct. 2038 ("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place."). In *Press Communications,* for example, the California Court of Appeal invalidated a city ordinance prohibiting the distribution of certain commercial and campaign material to private homes. The court held that the city's justifications for the rule—preventing crime and litter—was invalid because the ordinance did not restrict other literature which was equally likely to contribute to the same problems of crime and litter. *Press Communications,* 31 Cal.App.4th at 42, 36 Cal.Rptr.2d 456 ("[R]eliance upon this abstractly content-neutral interest presumes [the restricted commercial speech] contribute to these problems while other categories of written materials do not. The City offered no evidence to establish such a presumption."). *See also Discovery Network,* 507 U.S. at 429, 113 S.Ct. 1505 (holding city ordinance barring the display of commercial material, but not non-commercial material, from news racks unconstitutional because both commercial and noncommercial publications are equally responsible for the city's safety concerns and visual blight); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (finding unconstitutional Illinois law permitting labor picketing but restricting non-labor picketing because both forms of picketing involve the same concerns of privacy intrusion); *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invalidating Chicago ordinance under the First Amendment because it prohibited non-labor picketing while allowing labor picketing near schools because both forms of picketing are equally prone to incite violence, which was Chicago's stated concern in enacting the restriction).

Petitioners' rationale for justifying their rule prohibiting certain groups from naming a Galleria tenant, owner, or manager—disruption of their tenants' business—is similarly undermined by the fact that Petitioners allow organizations to name a tenant in a primary labor dispute. Petitioners offer no reason why a secondary boycott, in which Union members boycott a company because of the company's *affiliation* with their employer, might be more disruptive to business than a primary boycott. In fact, naming a tenant in a primary labor dispute has the potential to cause more damage to a Galleria tenant's business because primary labor disputants directly attack the tenant's practices. Because the speech Petitioners exempt from their rule invokes the very concerns that Petitioners use to justify the restricted speech, their rationale cannot be considered compelling. *See, e.g., Press Communications,* 31 Cal.App.4th at 42, 36 Cal. Rptr.2d 456; *Discovery Network,* 507 U.S. at 429–30, 113 S.Ct. 1505; *Carey,* 447 U.S. at 466–67, 100 S.Ct. 2286; *Mosley,* 408 U.S. at 101, 92 S.Ct. 2286.

Furthermore, Petitioners' rule is untenable under California law because as they admit, Petitioners maintain and enforce the rule because they disfavor speech that may adversely affect their business. California courts and the Supreme Court have struck down similar restrictions that are "based on hostility—or favoritism—to-

constitutional issues" but found that the issue was not adequately preserved for appeal.

*UNITE v. Superior Court,* 56 Cal.App.4th 996, 1020, 65 Cal.Rptr.2d 838 (1997).

wards the underlying message expressed." *R.A.V.*, 505 U.S. at 377, 112 S.Ct. 2538 (finding city ordinance that criminalized placing inflammatory literature on private property was an unconstitutional content-based regulation); *see also Mosley*, 408 U.S. at 96, 92 S.Ct. 2286 ("Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."); *U.C. Nuclear Weapons Labs Conversion Project*, 154 Cal.App.3d 1157, 201 Cal.Rptr. 837 (government lab's policy of limiting ideologically incompatible speech in lab's facility impermissibly favored government speech over dissenting views). In restricting such critical speech about their tenants, owners, or managers, Petitioners' rule contravenes the purpose of California free speech protections: the preservation of discussion of issues even when they are contrary to a regulating party's belief or interest. *Id.* at 1169–70, 201 Cal.Rptr. 837 ("Far from sharing our dissenting colleagues' alarm at such a prospect [of dissenting speech at government facilities], we believe that it is just such a robust exchange of ideas that the free speech provisions the [California] Constitution was designed to promote.... Just because the center is owned by the [regulating entity] does not give it the right to alone communicate with the public."). The California Constitution does not permit censorship of contrary ideas. *Los Angeles Alliance for Survival*, 22 Cal.4th at 376–77, 93 Cal.Rptr.2d 1, 993 P.2d 334.

■ Based on the above stated reasons, we hold that Petitioners acted without a state property interest in enforcing and promulgating a rule restricting certain groups from distributing literature that named a Galleria tenant, owner, or manager, on the Galleria premises. Petitioners' rule is an impermissible content-based restriction on speech under the California Constitution. We thus hold that Petitioners violated the Union's Section 7 rights by ordering, under threats of calls to the police, the Union to leave its premises unless it removed Disney's name from its handbills.

## CONCLUSION

In No. 01–71566, the petition for review is DENIED. In No. 01–71746, the Board's order is ENFORCED.